This letter is Deutscher Tennis Bund v. ATPTour. Mr. McGill? Good morning. Good morning. I'm Robert McGill, representing the appellants in this matter, and I would ask leave of court to reserve five minutes for rebuttal. All right. This case involves an association of competitors, the ATP, certain favored tournaments, and top players who agreed to restrain trade in the player services market. Right. We're familiar with the facts, and tell us why the district court made errors in granting judgment as a matter of law and why the jury was wrong. And there's some very interesting issues, including single entity and instruction and some other matters as well. Yes, Your Honor. The single entity instruction, it was error for the district court to give the single entity instruction here. We know from Supreme Court precedent that the Copperwell decision tells us that a properly constituted parent-subsidiary relationship is immune from antitrust scrutiny because the parent and subsidiary are incapable of conspiring. We know also from the Texaco v. Dogger case that a lawful joint venture is also incapable of conspiring for the same basic reasons. But what's the answer here and what's the proper legal analysis here? Well, the Third Circuit has already told us on two separate occasions in terms of how should the analysis be made here in single entity. This court told us in the Weiss decision specifically that antitrust policy requires court to seek the economic substance of the arrangement at issue. And further, this court told us that where there is an association of competitors, such as the ATP here, their actions are subject to scrutiny under Section 1. Isn't this a circumstance, though, where, as in other professional sports leagues, you can't produce the product with that close coordination, cooperation, and mutual joint effort? You couldn't produce it without everybody being in the same box and making joint decisions, could you? Well, yes, you could. And, in fact, with respect to the player services market that's involved here, these were distinct entities economically and functionally because the ATP, with respect to the player services market here, was an association of competitors. And specifically, the ATP was a consumer in the player services market that was involved here relative to its Tennis Masters Cup event. I'm glad you mentioned market because I wonder if we even get to the single entity issue, if your opponents are correct that the failure to prove the relevant market on Section 2 means you can't prove it as to Section 1 and that's game over, right? It does not mean that. And it does not mean that for several reasons. First, the Quick Look scrutiny was appropriate here and it was error as a matter of law not to apply Quick Look scrutiny here. Isn't that a question of law? Has Quick Look ever been treated as a question of fact before? Quick Look is a mode of analysis for the district court initially and de novo for this court on appeal. So that's a question of law, right? It's a question of law. Why should the district court have instructed and given the question of Quick Look to a jury? Because the court should have, in the first instance, taken the step of saying that the proper analysis, the proper mode of analysis here specifically was Quick Look scrutiny, which means that the jury is given the balancing that is involved with the Brown University balancing that this court describes specifically in the Brown University decision. That is that once the court determines that the appropriate mode of analysis is to look specifically on a Quick Look basis. Then isn't your complaint with the district court not agreeing with you that this was a Quick Look case and not with the assertion that it should have gone to the jury? That's where I guess I'm having a hard time. Your argument is couched in terms of the jury should have been instructed about Quick Look, but you seem to be acknowledging that whether something is given a Quick Look, a mode of analysis called Quick Look, is a question of law for the court. So I'm still, maybe I don't mean to be obtuse, but I'm not understanding how the court could have said to the jury, look, go ahead and we want you to think about this in a Quick Look way. That's a question of law for the court, isn't it? Well, we think that this court's precedent in Brown University answers the question and answers it squarely because in the mode of analysis, the district court in the first instance decides what is the proper mode of analysis. Is it Quick Look or not? What this court wrote in the Brown University case is if the district court makes that conclusion, then a particular type of balancing occurs. And that's what the Brown University holding said. Good, but I still don't understand why it qualifies even under that analysis. I mean, what is the relevant market is one of the most disputed issues in this case. So it seems to me the anti-competitive effects are not, quote, easily ascertainable, as the Supreme Court said, in order to qualify, possibly qualify for the Quick Look method of analysis. And how do you get over that particular point? There just seem to be so many close, conflicting questions here that are not suitable for the Quick Look analysis. Well, we think, DeNovo, this court, looking at the evidence specifically here, has evidence of anti-competitive agreements that were made and that there were anti-competitive intentions that occurred. We also have, in this case, the unique circumstance where we have admitted anti-competitive effects by the chairman of the ATP. Yeah, but in an industry where the cases are all over the place. And, you know, hopefully we'll get some guidance from the Supreme Court this year. But you know the cases better than we do, I'm sure. But there is certainly— there's so many different approaches to these sports leagues' situations that it just seems to me that you're— if you're wrong on the Quick Look, and, you know, continue to argue it if you wish, if you're wrong on that, then I'd like you to go back to Judge Jordan's question as to why the relevant market failure proof there doesn't knock you out on everything else. If we're not correct on Quick Look? Yeah. Your Honor, first of all, with respect to the Quick Look analysis, we think it's appropriate here. The Quick Look was warranted for the reasons that we've indicated. But as this Court knows and as this Court has written, if Quick Look is applied, proof of relevant market is not required. And that proof is not required under a Quick Look analysis. That's what this Court wrote to us in Brown University some time ago. But with respect to the evidence that is there on the close questions, Your Honor, that you raised, are there close questions or not? We don't think so. Not in terms of the record that was here and the admissions that were made in the trial court with respect to the anti-competitive agreements and the anti-competitive intentions. You're still on Quick Look, though, right? Yes, Your Honor. Assume for the sake of discussion that we disagreed with you about Quick Look. If you lose on that, do you concede that having failed to make the market definition point stick under Section 2, that that means you lose under Section 1? Assume in a way the Quick Look issue. Your Honor, I'm still where I was before, and I hope I'm not failing to apprehend the essence of your question, but I don't think so. And for the reasons that we have stated. And with respect to the single entity instruction that was given here, if you're asking me to go back to that analysis and how we No, and I apologize for talking past each other. Let me try this one more time. I understand your assertion is, look, we should have had the benefit of not having to deal with the market definition under Section 1 because under a Quick Look mode of analysis, that would have meant the burden would have been on them, and that's the way the jury should have dealt with this. Or at least that's what I understand you to be saying, right? Yes. Okay. So let's set that aside for a minute. Assume for the purpose of discussion that we thought the district court got it right. This wasn't a Quick Look case. Okay? So the burden was on you to define a market under your Section 1 claim. Having failed to prove it with respect to Section 2, how could you survive the Section 1? Because we never, first of all, Section 1 and Section 2 are analytically distinct causes of action. Section 1 has one standard. Section 2 has another. Sure, but you have to define a relevant market for both, don't you? You do. And you didn't make any argument in the district court, did you, that there were different markets for Section 1 purposes and for Section 2 purposes, did you? We did not. Okay. So if you didn't prove it as to Section 2 and the jury said you didn't prove it as to Section 2, how could you survive the challenge to your Section 1 claim? Because under the instructions given to the jury and the verdict form tendered to the jury, the Section 1 inquiry was over after the first question was answered. That is, are these parties capable of conspiring based on the single entity issue? And with respect to how that jury reacted to the particular verdict form here, the first question on the verdict form went to the question is, are these parties involved here capable of conspiring? But why does that make a difference? How can it make a difference if the jury assumed that they had been given every instruction you had wanted with respect to single entity and they had said, okay, it's not a single entity. There could be collusion. But they have found, they have decided that you didn't prove what you needed to prove with respect to market. Aren't you, you still, you still come up short, right? Well, there is a case that this circuit has decided, Your Honor, with respect, and the case is Columbia Metal Culvert v. Kaiser Aluminum, cited at 579 Fed Second 20. And it was a decision in 1978 by this court where there was an analytical distinction made by this court on the proof requirements associated with Section 1 and Section 2. And what this court said there was this court made the analysis of how there are differences between the two types of claim. The jury, I don't think anybody is disputing that. The only, the only question that, maybe I've got your answer, but the question isn't whether there are differences analytically between Section 1 and Section 2. The question is if you have to prove a relevant market for both. And in the district court, you didn't assert that there was any difference between the relevant markets. And the jury said you didn't carry your responsibility to make the proof you needed to with respect to relevant market. How can there be anything left of your Section 1 claim? That's the question I'm putting to you, and maybe I've got my answer. If I may answer, I'm past my time. But I believe the answer is that with respect to the analysis the jury was given and required to make on the verdict form, they never got there. I just had one question I wanted to ask. Wouldn't you make a request that the court recognize the case is coming within the Quick Look framework at the outset rather than at the end when it was going to the jury? But you made it at the end, and you wonder, well, what's the point of the Quick Look at that point? You've tried the whole case, I mean. Well, and the reason for that is the court needs to hear the argument on what the evidence was or was not on anti-competitive effects, anti-competitive intentions. Whether there was admitted anti-competitive effects in the relevant player services market, we believe that under the analysis required by the court on what is the proper mode of analysis, that the district court had to hear the evidence first before it could determine as a matter of law whether or not the proof had been made for particular types of treatment. Well, aren't there inherently anti-competitive consequences? For example, you wouldn't have members of the court conducting tournaments at the same time. So, I mean, in a true competitive market, I'd say, well, that's a good weekend. We want to have a tournament that weekend. We don't care what they're doing over there, and then bid more for players and all that. I mean, that's real competition. But that doesn't exist here, does it? Well, real competition does not exist here because of the rules and requirements that were legislated through this Brave New World program. But you'd have total chaos, wouldn't you, in the – I used to play with model trains. I also played tennis. But wouldn't you have total chaos in the tennis world if you had a really wide-open competitive market? The answer is no, but the important precedent in the United States is the Brown University Third Circuit decision. This court described exactly how you deal with the problem that you just raised by your question. You have a balancing. Once the mode of analysis is selected, what this court had said in Brown University is you then engage in the very type of balancing that you've talked about. One, are there pro-competitive justifications? Two, what are the responses to those pro-competitive justifications? Are there better alternatives or less restrictive alternatives? But that's the evidence that gets played out on the very type of questions that you're asking about under the Brown University standard. And then before the jury, don't you get a full rule of reason analysis? You get a rule of reason analysis, which includes everything that this court wrote in Brown University. You have the decision made by the district court in the first instance, as you know, and then with what you instructed in Brown University, you make each of the three types of inquiry that you described. That is, both parties present evidence on both points, and that balancing that occurs is what you wrote in Brown University. But if the mode of analysis is made that way, and this court's balancing test is given to us and Brown University has applied through the adversary process, the jury then makes the analysis. Okay, good. Thank you very much. We'll have you back on rebuttal, Mr. McGill. Thank you. Mr. Ruskin, good morning. Good morning. My name is Brad Ruskin. I represent defendants' appellees, ATP Tour, Inc., and its board of directors. Let me begin, if I may, with three overarching and fundamental points in this case. Number one, after an 11-day trial, the jury determined that appellants failed to prove a relevant market. That claim, that fact, is in fact fatal to all appellants' antitrust claims. Second, in order to overturn the verdict here, the jury verdict here, on the Section 1 claim, the only antitrust claim on which they appeal, Hamburg must show error both on the claim failure to instruct on the quick look, and the decision to submit to the jury the factual question of whether Hamburg had proven the existence of any contract combination or conspiracy. In addition, number three, it must also prove antitrust injury. It has failed on all of those points. The third overarching point is that Hamburg tries to ignore here that it lost the jury trial, and further, that it failed to challenge the sufficiency of the evidence with respect to the jury's determinations. It ignores that in connection with the argument for relevant market. It ignores it with respect to quick look and single entity. It ignores it when it tries to make a number of so-called factual assertions. Well, why don't you respond, if you would, to Mr. McGill's assertion that if the court had properly selected quick look as the mode of analysis and instructed the jury in that regard, then it would not have had to address relevant market with respect to Section 1, and it should be entitled to go back and have a shot at this under the correct mode of analysis. Right. Your Honor, that argument is just wrong. Quick look does not ignore the necessity of having anti-competitive effects in a market. Quick look is a mode of analysis. What quick look recognizes is there are certain instances where a court looks at a certain type of conduct, and while it's not quite per se, it thinks based on its experience with that conduct that it might in that instance say, you know, look at this, and it appears that this can be condemned just on the basis of the conduct. And in that instance, it's in essence a presumption, if you will. And in that instance, if the defendants can present any pro-competitive justifications, the bubble is burst. Once the bubble is burst, then what must be done is a full-scale rule of reason analysis. And any full-scale reason analysis necessarily includes determination of relevant market, proof of relevant market, and determination of anti-competitive effects. And in fact, that's exactly what Brown University said. What the Brown University court said is... Isn't there a presumption that goes with quick look? I mean, wouldn't the jury have been instructed, taking Mr. McGill's argument, that you can assume that there's a problem here and step over that and move forward with your analysis? And the answer is no, Your Honor. What Brown University said is once the bubble is burst, once we're in the universe of not being certain that it can be condemned, once we're in the universe of recognizing that any pro-competitive justifications may have been raised, then we must do, in the words of Brown University, a full-scale rule of reason attest. And in fact, that's exactly what the Supreme Court recognized in Cal Dental when it was discussing Brown University. The Supreme Court, in describing Brown, which was a case that was really differentiating between whether or not a quick look analysis ought to be applied on the one hand or not, the Supreme Court recognized Brown said no in that case involving the overlap financial aid cases and said a full-scale rule of reason analysis is needed. That's what Brown says at page 669. I think one case that's helpful here that cuts across sort of the panoply of issues is the Frazier case in the First Circuit. The Frazier case in the First Circuit involved a challenge by players in that case to Major League Soccer's rules with respect to determining all-player compensation and determining where all players in the league were placed. Interesting factual history there. Initially, the district court determined as a matter of law that MLS and LLC was a single entity. The court then proceeded to trial, the case proceeded to trial on the Section 2 claim. The plaintiffs in that case, the players, failed to establish a relevant market. When the First Circuit looked at the case, it said several things. Number one, it said we don't think we understand the arguments of the single entity. We think there are factual issues there. We don't think that the court should have determined it as a matter of law. Second, it said when looking at issues— How does that point affect your case? Because several things. What the court then said in looking at the issues was not that you would apply some form of quick look, but rather it said, as in any other non-per se case, players would have to show that MLS exercised significant market power in a properly defined market, that the practices in question adversely affected competition in that market, and that on balance, the adverse effects on competition outweighed the competitive benefits. And that's a case where, of course, MLS was determining all compensation and placing all of the players. The other way that it affects our case, Judge Jordan, is that in that instance, as here, plaintiffs did not try to define any different market with respect to a Section 1 claim or a Section 2 claim. And so the court, upon finding that plaintiffs had failed to establish a relevant market on a Section 2 claim, said that similarly applied to the Section 1 claim. So it applies in all of those ways. And I would suggest to you there's something here in terms of the argument. I guess the worldwide basketball case as well noted that you need to find a relevant market when the effects are not obvious and absolute. When you don't apply quick look, you need to be able to find a relevant market. And there's certainly something here where even after an 11-day trial, plaintiffs were unable to show a relevant market. Certainly then it can't properly have been a quick look case. Certainly the relevant market and those effects were not so obvious, were not the type of case where it's rudimentary that anyone could know that the case had anti-competitive effects in a relevant market. And in the argument you've just heard, as in the briefs, you repeatedly hear appellants talk about them having established a player services market or the effects in the player services market. Well, the fact is they went to trial and at that trial they were unable to establish a player services market of any type. They tried to define some type of market that they called a player's top tier market. But they failed to produce evidence of substitutability. They failed to properly show how that market wasn't internally inconsistent because it was dependent, in fact, on succeeding within the very nature of the tour. So for all those reasons, they never established a relevant market. And to the question that you asked, when it isn't a proper quick look case, the fact of no relevant market is certainly dispositive. Can I ask you a question about the state law claims that you guys faced? Thank you. Can you talk for a moment about why it should not – what was less than self-interested in the voting by the director who had an interest in the Indian Wells tournament? Sure. So several things. Number one, that claim goes to the duty of loyalty. First, they never – in opposing our Rule 50 motion, they never took on or opposed the duty of loyalty piece of their fiduciary duty claim. They only argued with respect to duty of care and duty of good faith and fair dealing. So that's one. Number two, it wasn't self-dealing in this circumstance because there was no direct benefit only to Mr. Passerell's tournament. He was a minority owner in that tournament and the nature of the benefits here were not tournament-specific. They went to the creation of the entire tour, the format that's at the core of what it is that the tour creates, the existence of tiers, the existence of a ranking system, the existence of player commitments. All those are the acts that the tour has taken in creating its product from day one. All those are the type of decisions that the tour takes every year, year on to year, and necessarily all of its board members take. Did it make any difference then whether Indian Wells was doing well or not doing well? That seems to me irrelevant under that analysis. I think it is probably not relevant in that analysis. The Court noted that. I think in that sense it wasn't a specific act designed to change the nature of Indian Wells, so in that sense maybe it's relevant. I think the other point here, though, that ultimately is relevant is the Sinorama case. Even were it interested, as the Sinorama case makes clear, there was a majority of disinterested directors who also voted in this case. The bylaws here required, didn't they not, that you have a certain number of the tour owners voting for it? So how does the Sinorama generalized majority of disinterested directors play into that? Because Sinorama separates the bylaw requirements, the contractual requirements of supermajority from the business judgment rule. There was a supermajority, so the bylaws were satisfied. Sinorama then says in order to maintain the presumption of the business judgment rule, you just need a majority of directors. The Sinorama deals with that issue head on. On that, is the District Court right that individual liability should be limited to per se violations? It is, Your Honor. The District Court, again, the claim against the individual directors is wholly derivative of the other antitrust claims here. But Murphy-Tugboat is the case that the District Court relied on, and rightly so. When you're dealing in this area. But a lot of that's been criticized quite a bit, hasn't it, in that case? I think in general, more cases have certainly supported Murphy-Tugboat, and, in fact, even the cases cited by appellants in this case, for example, the Brown v. Donko case, supported Murphy-Tugboat. What Murphy-Tugboat recognizes, particularly when you're dealing with civil liability of directors in this area and all the potential consequences in the antitrust laws, is that you only want to attack or only want to find liability on behalf of offices and directors where it is certainly knowing conduct. And I think without the per se rule of reason division, a director can be engaging in conduct, and certainly directors engaged in here, that they, in good faith, believe is pro-competitive and justified. And to hold them individually liable in that circumstance would be problematic. To turn back, one other point, a quick look, and then something on single entity. I guess two things. Number one, with respect to quick look, it would be nonsensical. And, in fact, it suggests to this court, appellants cannot point to a single case in which a jury verdict finding that plaintiff had failed to prove a relevant market should be reversed on the ground that the court should have applied a quick look beforehand. To our knowledge, it doesn't exist. And, indeed, with respect to the instructions to the jury, the ABA model jury instructions agree with our reading. In the footnote at instruction AA note 2, which we cite at page 36 of our brief, the model and jury instructions state, no jury instructions on quick look because, quote, application of the quick look analysis is a question of law to be determined by the court. I would also say this would in no way, shape, or form would have ever been an appropriate case for quick look. By the way, plaintiff's appellants never actually moved for quick look here. They only attended a jury instruction in which it assumed that a quick look had been found. They never made a motion at any point in time under Rule 50 or otherwise for a quick look determination. But, in all events, the conduct here is certainly not inherently suspect as fundamental to all sports, professional sports organizations, is some degree of interdependence, and a high degree of interdependence in order to create that product. This is certainly not a naked restraint on output or on price. Indeed, what's remarkable in this case is plaintiff's never pointed. It's a pretty fact-intensive inquiry, isn't it, about the character of the cooperation required to put out the product and the degree of cooperation necessary. That's exactly right, and that's exactly why these issues all went to the jury. And that's exactly why the jury then found they had failed to prove a relevant market. It's exactly why it would never have been an appropriate case for a quick look. By the way, the very words, the very words of one of the key representatives of Homburg when he was describing the difference between what happened here, his words, it was only, quote, a disagreement of judgment. DTV had one view, ATP had another. ATP made a judgment on how the circuit ought to be structured with respect to format. But Homburg at all times, at all times, has supported a structure of tiers, of player commitments, of ranking systems and the like. There's a letter at JA 5423 in which they describe how important it is to have a strong first tier, how important it is to have player commitments and the like. Last point with respect to single entity. We'll just note as a starting point that when you look at who plaintiffs chose to sue in this very case, it tells you something that in fact ATP Inc. operated through its fully constituted board of directors in adopting the format they did here. They sued ATP to the corporation and they sued its board of directors. And then they went forward and they even asserted, as we've just discussed, fiduciary duty claims against that board of directors. By the way, that isn't present in I think any of the other sports cases that I'm aware of. They recognized that this was a decision of a duly constituted board. And that's what went to the jury. And what went to the jury in that instance was all sorts of evidence about the ways in which this is coordinated activity. And therefore the jury properly found an absence of concerted activity. I see my time is up. Good. Any other questions? Thank you very much. Good. Mr. Ruskin, thank you very much. Mr. McGill? If we could come back to two or three points. First, with respect to this circuit's decision in Columbia Metals. This circuit has confirmed in Columbia Metals, in that case, this court specifically recognized that failure to prove market under Section 2 does not necessarily mean you lose under Section 1. Second, what else did this court tell us on this quick look doctrine? Again, we go back to Brown University. Under the full scale rule of reason that this court described in Brown University specifically, if quick look is the mode of analysis selected by the district court, the jury does not go back to the question of market. Why don't you respond, if you would, to Mr. Ruskin's point or assertion that you never asked the district court to adopt the quick look mode of analysis. You tendered a jury instruction, which assumed it, and asked the district court to submit that. But you never said move or otherwise ask the district court to make the judgment of law. This goes back to what I believe Judge Rainberger was asking about in part, and that is not until the court has heard the evidence on which it can make its mode of analysis determination are you in a position to ask, in this case, through the jury instructions. Really, you don't think that there's some obligation to give the other side in the court a heads up that you have a specific analytical framework that you think the jury should be obligated to go by before you get to the jury instruction stage? We did pretrial in the sense that we had preliminary jury instructions, and in our jury instructions that we attended were the quick look instructions, which tracked the Brown University decision of this court, and specifically put everybody on notice that that was the view that we had here. Isn't there a question of law that has to be answered first by the district court? That is, whether quick look applies? It is the mode of analysis. Okay, and if you never asked the district court to do that, don't you have a problem? We did ask the district court through the instructions, because that's the only mechanism that I know that you can bring this to the fore in this sense. The judge hears the evidence from both sides. The judge hears the evidence from the plaintiffs, and the judge hears the evidence from the defendants. Is there any rebuttal evidence, yes or no? Now what are we going to do in terms of instructing the jury? That's the context in which this arises. It would be premature before they have a chance to put their evidence in one way or another. The district judge has to hear everything. With respect to this is a product, with respect to the anti-competitive activity, this is not a product. This is the player services market, and analytically that's where this case begins, and it may be in your determination where it ends. It begins there and ends there because it's about player services. If it were a product, entertainment or competition in entertainment, that would be a different and analytically distinct analysis. It's not. It's about player services. If it were just an ATP product, and it's not, then why would the ATP here, as confirmed in Exhibit 1500, 1502 and 1499, reached outside the tour and made agreements with the Grand Slams or the International Tennis Federation if it was about a product, or the Davis Cup? The player services anti-competitive agreements reached across the entire spectrum of tennis. Well, isn't that sort of what Mr. Ruskin was saying when he was winding up? And he said, you guys sued ATP and a board of directors in a way that acknowledged it was a single entity, didn't try to sue the Davis Cup or the Grand Slams and say there was collusion with them. You picked ATP, and you focused on it, and you said there were breaches of duty, and those are classic assertions against an entity, a corporate entity, and therefore, by the very way they approached the case, have acknowledged that this is a single entity case. What's your response to that? We didn't. We knew there were three economically and functionally distinct actors, ATP, the players, and select tournaments. With respect to who we sued, we sued the parties that were involved, that we did sue that you know about. But with respect to what happened here in terms of when did we gain the information about the agreement with the Grand Slams, that is Exhibit 1499, the year-end tournament agreement, when did we get that, Exhibit 1500 and 1502? Just a few months before the trial itself. We came to understand as the case was discovered and litigated exactly what was happening here. Are they a single entity for purposes of what this court said in Weiss? No. What you told us from the beginning, and we knew it at the time that we litigated the case, you look to the economic substance of the arrangements involved. And the economic substance had three distinct actors. And with respect to the player services market, yeah, did they go beyond themselves and beyond the product itself and the ATP? Yes. They went to the International Tennis Federation and made an agreement with them. They went to the Grand Slams, they made an agreement with them, and they weren't done yet. Because then they made an agreement associated with the Davis Cup competition. With respect to all top-tier tennis competition, they locked up the player services for their own purposes. Is it a close question as you've asked before? It's not a close question based on these circumstances. For all these reasons, we asked the court to remand this case for a quick look treatment, to make a declaration that this is not a single entity for antitrust purposes, and to abide by what this court has already written in Brown University and what this court has already written in Weiss. Thank you very much. Thank you, Mr. McGill. Thank you, Mr. Ruskin. The case was very well argued. We will take this case under advisement.